1
2
3
4
5
6
7
8                              UNITED STATES DISTRICT COURT

9                              EASTERN DISTRICT OF CALIFORNIA

10

11   CURTIS CHRISTOPHER LEE JONES,          Case No.  1:20-cv-01488-EPG

12                 Plaintiff,

13          v.                              FINAL JUDGMENT AND ORDER
                                            REGARDING PLAINTIFF'S SOCIAL
14   COMMISSIONER OF SOCIAL                 SECURITY COMPLAINT
     SECURITY,
15                                          (ECF No. 23)
                   Defendant.
16

17

18
           This matter is before the Court on Plaintiff Curtis Christopher Lee Jones' ("Plaintiff")
19
     complaint for judicial review of an unfavorable decision by the Commissioner of the Social
20
     Security Administration regarding his application for Supplemental Security Income benefits. The
21
     parties have consented to entry of final judgment by a United States Magistrate Judge pursuant to
22
     28 U.S.C. § 636(c), with any appeal to the Court of Appeals for the Ninth Circuit. (ECF Nos. 7,
23
     9-10.)
24
           The matter was taken under submission on the parties' briefs without a hearing. Having
25
     reviewed the record, the administrative transcript, the parties' briefs, and the applicable law, the
26
     Court finds as follows.
27   ///
28   ///

                                               1

## I.      DISCUSSION

### A.      Dr. Singh's Medical Opinions

Plaintiff first argues that the Administrative Law Judge ("ALJ") erred in weighing treating physician Jasmine Singh, D.O.'s medical opinion. (ECF No. 23 at 17-27.)

#### 1.      Legal Standards

In this circuit, courts distinguish the opinions of three categories of physicians: (1) treating physicians; (2) examining physicians, who examine but do not treat the claimant; and (3) non-examining physicians, who neither examine nor treat the claimant. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1996). In general, the opinion of a treating physician is afforded the greatest weight. *Id.*; *see also* 20 C.F.R. § 404.1527(d)(2); *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989). Further, an examining physician's opinion is given more weight than the opinion of non-examining physician. *Pitzer v. Sullivan*, 908 F.2d 502, 506 (9th Cir. 1990); 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). The Ninth Circuit has held regarding such opinion testimony:

> The medical opinion of a claimant's treating physician is given "controlling weight" so long as it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record." 20 C.F.R. § 404.1527(c)(2). When a treating physician's opinion is not controlling, it is weighted according to factors such as the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability, consistency with the record, and specialization of the physician. *Id.* § 404.1527(c)(2)–(6). "To reject [the] uncontradicted opinion of a treating or examining doctor, an ALJ must state clear and convincing reasons that are supported by substantial evidence." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008) (alteration in original) (quoting *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005)). "If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence." *Id.* (quoting *Bayliss*, 427 F.3d at 1216); *see also Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998) ("[The] reasons for rejecting a treating doctor's credible opinion on disability are comparable to those required for rejecting a treating doctor's medical opinion."). "The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989) (quoting *Cotton v. Bowen*, 799 F.2d 1403, 1408 (9th Cir. 1986))

*Trevizo v. Berryhill,* 871 F.3d 664, 675 (9th Cir. 2017).[1]

---

[1] The Social Security Administration has adopted new rules applicable to claims filed after March 27, 2017, which

2

The Court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record. 42 U.S.C. § 405(g); *Batson v. Comm'r of Soc. Sec. Admin.,* 359 F.3d 1190, 1193 (9th Cir. 2004); *Coleman v. Saul,* 979 F.3d 751, 755 (9th Cir. 2020) ("Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."). It is the ALJ's responsibility to resolve conflicts in the medical evidence and ambiguities in the record. *Ford v. Saul,* 950 F.3d 1141, 1149 (9th Cir. 2020). Where this evidence is "susceptible to more than one rational interpretation," the ALJ's reasonable evaluation of the proof should be upheld. *Ryan v. Comm'r of Soc. Sec.,* 528 F.3d 1194, 1998 (9th Cir. 2008).

    2.   <u>Analysis</u>

Dr. Singh completed a physical medical source statement ("MSS") dated August 9, 2016. (A.R. 544-47.) Dr. Singh noted that her frequency and length of contact with Plaintiff was one hour, and his symptoms included pain and impaired mobility. (A.R. 544.) Dr Singh opined that Plaintiff could walk for one and a half blocks, sit for two hours, and stand for ten minutes at a time. (A.R. 544.) In an eight-hour workday, Plaintiff could stand and walk for less than two hours and sit for about two hours. (*Id.*) Plaintiff must elevate his legs two-to-three feet high with prolonged sitting. (A.R. 545.) When engaging in occasional standing and walking, Plaintiff must use a cane for imbalance. (*Id.*) Plaintiff could occasionally lift up to ten pounds and never more than twenty pounds, and could never twist- stoop, crouch/squat, climb stairs, or climb ladders. (*Id.*) He had significant limitations with reaching, handling, or fingering and could perform fine manipulations only thirty percent of the time and reach overhead only ten percent of the time in an eight-hour workday. (A.R. 545-46.) Plaintiff would likely be off task for twenty percent of a typical workday. (A.R. 546.) Dr. Singh indicated that Plaintiff was incapable of even "low stress" work because "[d]ue to valley fever patient cannot be outside." (*Id.*) When asked to assume if Plaintiff was working full time how many days on average he would likely be absent from work as a result of his impairments, Dr. Singh marked "never" and wrote "Patient is not trying to work

---

revise the rules regarding evaluation of medical opinions. However, these revisions do not apply to Plaintiff's claim, which was filed in 2015.

full time." (*Id.*) Dr. Singh additionally opined that Plaintiff cannot walk a block at a reasonable pace on rough or uneven surfaces, use standard public transportation, carry out routine ambulatory activities such as shopping and banking, or climb stairs at a reasonable pace using a hand rail. (*Id.*) Under her signature, Dr. Singh wrote "Patient is new to me and form was filled out based on patient's report to me." (A.R. 547.)

Dr. Singh also completed a mental MSS dated August 9, 2016. (A.R. 548-51.) Dr. Singh again noted that her frequency and length of contact with Plaintiff was one hour and his signs and symptoms included appetite disturbance with weight change and decreased energy. (A.R. 548.) Dr. Singh opined that Plaintiff's abilities to remember work-like procedures, sustain an ordinary routine without special supervision, ask simple questions or request assistance, accept instructions and respond appropriately to criticism from supervisors, get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes, respond appropriately to changes in a routine work setting, deal with normal works tress, be aware of normal hazards and take appropriate precautions, understand and remember detailed instructions, set realistic goals or make plans independently of others, and use public transportation would each preclude performance for five percent of an eight-hour workday. (A.R. 549-50.) Plaintiff's abilities to maintain regular attendance and be punctual, carry out detailed instructions, and deal with stress of semiskilled and skilled work would each preclude performance for ten percent of an eight-hour workday. (*Id.*) Additionally, Plaintiff's ability to perform at a consistent pace without an unreasonable number and length of rest periods would preclude performance for fifteen percent or more of an eight-hour workday. (A.R. 549.) When asked to explain these opinions, Dr. Singh did not respond. (A.R. 549-50.) Dr. Singh opined that Plaintiff would, on average, be absent from work for four or more days per month. (A.R. 551.) Under additional comments, Dr. Singh wrote "[t]his questionnaire was completed based on patient's report to me. Patient is new to me." (A.R. 551.)

Dr. Singh's opinion was contradicted by State Agency physicians L. Kiger, M.D. and C. Bullard M.D., as well as consultative examiner Mickey Sachdeva, M.D., all of whom opined that Plaintiff's functional limitations were less severe than those opined by Dr. Singh. (*See* A.R. 139-

47, 149-57, 703-15.) Thus, the Court examines whether the ALJ provided specific and legitimate reasons supported by substantial evidence for discounting Dr. Singh's opinions.

The ALJ weighed Dr. Singh's opinions as follows:

> The opinion at Exhibit B4F by Jasmine Singh, D.O., was based on only one hour of contact and the claimant's subjective report to Dr. Singh. (Ex. B4F). Dr. Singh's clinical findings were troubling [sic] walking and standing but improvement with medication. She opined that the claimant was severely limited. She found he could sit for only two hours and stand/walk for less than two hours with a 10-minute period of standing. She also found limitations on fine fingering at 30% of the workday and limited reaching overhead to 10% of the workday. This opinion is given little weight because the record supports only occasional limitations on standing and walking, with many appointments showing he had full strength or near full strength. Moreover, the claimant was a new patient to Dr. Singh.
>
> At the same time, Dr. Singh also completed a mental medical source statement and reported that the claimant had appetite disturbance with weight change and decreased energy. (Ex. B5F/1). The claimant was precluded from performance for 10% of an eight-hour workday in the following areas: maintain regular attendance and be punctual within customary (usually strict) tolerances, carry out detailed instructions and deal with the stress of semi-skilled and skilled work. He was precluded from performance for 15% or more of an eight-hour workday in the ability to perform at a consistent pace without an unreasonable number and length of rest periods. He did not have reduced intellectual functioning. He would be absent from work for more than four days per month. His impairment would last at least 12 months. Alcohol or substance abuse did not contribute to any of these limitations. The claimant could manage benefits in his own best interest. (Ex. B5F). As before, Dr. Singh admitted that the claimant was new to her, she had spent only one hour with him, and the form was filled out based upon the claimant's report to her. (Ex. B5F/4). This opinion is given little weight because it is not clear whether Dr. Singh is even a mental health specialist and the medical record showed that the claimant had no medically determinable mental impairment. Moreover, there were no specific limitations articulated and this opinion is not objective as it is based solely on the claimant's report and a very minimal treating relationship. Records showed normal mood, affect and behavior. (Ex. B2F/39; B11F/73, 153).

(A.R. 27.)

The ALJ discounted both of Dr. Singh's opinions because Plaintiff was a new patient and the treating relationship was "very minimal." (A.R. 27.) Plaintiff argues that this was in error because Dr. Singh's opinions were consistent with the overall treating record. (ECF No. 23 at 23.) Plaintiff contends that the ALJ erred by discounting Dr. Singh's opinions in favor of opinions from State Agency physicians, who never examined or treated Plaintiff, and from consultative examiner Dr. Sachdeva, a one-time examining physician who never treated Plaintiff or reviewed any of his medical history. (ECF No. 23 at 23.) The Commissioner, in turn, argues that the ALJ

properly considered the length of the treating relationship when discounting Dr. Singh's opinion. (ECF No. 26 at 7.)

An ALJ may properly "consider factors such as the length of the treating relationship, the frequency of examination, the nature and extent of the treatment relationship, or the supportability of the opinion" when analyzing a treating physician's opinion that has not been given controlling weight. *Trevizo v. Berryhill,* 871 F.3d 664, 676 (9th Cir. 2017); *see also Orn v. Astrue,* 495 F.3d 625, 633 (9th Cir. 2008) (reasoning that the nature and extent of the relationship with the claimant affected the weight afforded to a treating physicians' opinion); *Melton v. Berryhill,* 2019 WL 691198, at *7 (E.D. Cal. Feb. 19, 2019) (finding that a limited treating relationship was a clear and convincing reason for discounting a treating physicians' opinion). However, limited observation of the claimant cannot be the sole reason for rejecting a treating physicians' opinion, and "is not a reason to give preference to the opinion of a doctor who has *never* examined the claimant." *Lester v. Chater,* 81 F.3d 821, 832 (9th Cir. 1995) (citation omitted, emphasis in original); *see also Rodriguez v. Berryhill,* 2017 WL 896304, at *10 (E.D. Cal. Mar. 7, 2017) ("[T]he presence of a limited treatment relationship cannot alone constitute a legitimate reason for rejecting a treating source's opinion.") (citations omitted); *Fernandez v. Comm'r. of Soc. Sec.,* 2020 WL 3497004, at *7 (E.D. Cal. June 29, 2020) (accord).

Here, the ALJ did not rely solely on Dr. Singh's limited observations of Plaintiff and articulated other permissible reasons for discounting Dr. Singh's opinions as discussed further below. Additionally, while Plaintiff is correct that the State Agency physicians did not examine Plaintiff, the ALJ only gave these opinions "some weight" because the record supported greater limitations than those set forth in the State Agency physicians' opinions. (*See* A.R. 27.) Further, the limitations from the State Agency physicians' opinions that the ALJ did adopt, including that Plaintiff could occasionally climb ramps and stairs, could never climb ramps, ropes, or scaffolds, and must avoid unprotected heights and dangerous moving machinery, were not addressed in Dr. Singh's opinions. (*See* A.R. 544-51.) The ALJ accordingly did not err because she did not give preference to the State Agency physicians over Dr. Singh's opinions.[2]

---

[2] Plaintiff also argues that the ALJ's reliance on Dr. Singh's limited treatment relationship was "not 'legitimate'" because consultative examiner Dr. Sachdeva's treatment relationship with Plaintiff was equally as brief as Dr. Singh's, and Dr. Sachdeva did not review Plaintiff's medical records. (ECF No. 23 at 23.) However, in contrast to the

In giving Dr. Singh's opinions little weight, the ALJ also noted that the reports were based on Plaintiff's subjective reports. (A.R. 27.) The Ninth Circuit has explained that an ALJ may reject a physician's opinion that is premised on a claimant's own subjective complaints that the ALJ properly discredited. *Fair v. Bowen*, 885 F.2d 597, 605 (9th Cir. 1989); *Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008) ("An ALJ may reject a treating physician's opinion if it is based 'to a large extent' on a claimant's self-reports that have been properly discounted as incredible.") (q*uoting Morgan v. Comm'r Soc. Sec. Admin.*, 169 F.3d 595, 602 (9th Cir. 1999)).

Here, Dr. Singh expressly stated that she completed the forms based on Plaintiff's reports because he was a new patient to her. (A.R. 547, 571.) Dr. Singh did not identify any other bases for her opinions and, in several instances, did not provide any further information when asked to explain her responses. (*See* A.R. 543-71.) Additionally, as discussed further below, the ALJ properly discounted Plaintiff's subjective symptom testimony. Thus, the ALJ's finding that Dr. Singh's opinions were entitled to reduced weight because they relied on Plaintiff's subjective complaints is specific and legitimate and supported by substantial evidence.

The ALJ also discounted Dr. Singh's physical MSS because the limitations on standing and walking were inconsistent with the record and "many appointments show[ed] he had full strength or near full strength." (A.R. 27.) Plaintiff does not dispute that this is a specific and legitimate reason for discounting Dr. Singh's opinion, and instead argues that the ALJ was "playing" doctor and "using her own lay knowledge" in concluding that findings of 4/5 motor strength indicated only occasional weakness rather than significant weakness. (ECF No. 23 at 23-24.) (Emphasis omitted.) Plaintiff cites to "online medical literature" to demonstrate that the ALJ's interpretation of the medical evidence was incorrect. (*Id.* at 24.)

While an ALJ may not substitute their medical knowledge for a doctor's expertise, he or she is nonetheless responsible for interpreting and resolving conflicts in the evidence. *See Lingenfelter*, 504 F.3d at 1042 ("When evaluating medical opinions of treating and examining physicians, the ALJ has discretion to weigh the value of each of the various reports, to resolve

---

State Agency physicians, Dr. Sachdeva examined Plaintiff. (*See* A.R. 703-07.) Further, the ALJ gave reduced weight to Dr. Sachdeva's opinion because the record supported greater limitations than those set forth in his opinion. (A.R. 27.) Notably, Dr. Singh stated that her opinions were premised on Plaintiff's reports and did not indicate that she examined Plaintiff prior to completing the forms or that she reviewed Plaintiff's medical records. (*See* A.R. 544-51.)

conflicts in the reports, and to determine which reports to credit and which to reject.").

Here, the ALJ did not interpret raw medical data in functional terms or make independent medical findings as Plaintiff suggests. Instead, the ALJ properly discharged her obligation to weigh the evidence and reasonably interpreted the medical evidence regarding Plaintiff's strength as inconsistent with Dr. Singh's findings that he was severely limited in his ability to stand and walk. Notably, the record did not solely include findings of 4/5 motor strength. As the ALJ noted, "[m]any appointments reflected strength was 5/5" or normal. (A.R. 23; *see also* A.R. 468, 500, 503, 507, 574, 618, 706, 721, 746, 761, 844.) Although Plaintiff may disagree with the ALJ's assessment of the medical opinion evidence, the ALJ's interpretation is rational in light of the circumstances and therefore must be upheld. *See Lingenfelter v. Astrue,* 504 F.3d 1028, 1042 (9th Cir. 2007) ("When evaluating the medical opinions of treating and examining physicians, the ALJ has discretion to weigh the value of each of the various reports, to resolve conflicts in the reports, and to determine which reports to credit and which to reject."); *Andrews v. Shalala,* 53 F.3d 1035, 1039–40 (9th Cir. 1995) ("We must uphold the ALJ's decision where the evidence is susceptible to more than one rational interpretation.").

The ALJ further discounted Dr. Singh's mental MSS because it was not clear that Dr. Singh is a mental health specialist and Plaintiff did not have a medically determinable mental impairment. (A.R. 27.) There is no requirement that psychiatric evidence must be offered by a Board-certified psychiatrist. *Sprague v. Bowen,* 812 F.2d 1226, 1232 (9th Cir. 1987). "Under general principles of evidence law [a treating physician] is offered to give a medical opinion as to [the claimant's] mental state as it relates to her physical disability even though [the treating physician] is not a psychiatrist." *Id.* (Citations omitted.) Thus, the ALJ erred in discounting Dr. Singh's opinion regarding Plaintiff's mental limitations on this basis.

However, the ALJ provided other valid reasons supported by substantial evidence for discounting this opinion as discussed herein and therefore any error was harmless. *See, e.g.*, *Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1162 (9th Cir. 2008) ("So long as there remains 'substantial evidence supporting the ALJ's conclusions ...' and the error 'does not negate the validity of the ALJ's ultimate ... conclusion,' such is deemed harmless and does not warrant reversal." (quoting *Batson,* 359 F.3d at 1197)). As discussed above, the ALJ discounted

8

Dr. Singh's Mental Medical Source Statement due to the limited treating relationship with Plaintiff and because the opinion was based on Plaintiff's subjective reports, which was reasonable and supported by substantial evidence. In addition, the ALJ discounted this opinion because "there were no specific limitations articulated" and "[r]ecords showed normal mood, affect and behavior." (A.R. 27.) "[A]n ALJ may discredit treating physicians' opinions that are conclusory, brief, and unsupported by the record as a whole, ... or by objective medical findings." *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1195 (9th Cir. 2004). The parties' briefing does not address these reasons for discounting Dr. Singh's opinion. (*See* ECF Nos. 23, 26, 29.) Having reviewed the record as a whole, including evidence that supports and detracts from the ALJ's finding, the Court finds that the ALJ's reasoning is supported by substantial evidence.

Finally, Plaintiff argues that the ALJ erred by failing to specifically address Dr. Singh's opinion in her physical MSS that Plaintiff was limited to fine fingering for 30% of the workday and reaching overhead for 10% of the workday. (ECF No. 23 at 25.) The Commissioner's briefing argues that the ALJ's reasons for discounting Dr. Singh's opinions were legally sufficient and supported by substantial evidence, but does not specifically address Plaintiff's argument concerning these limitations. (*See* ECF No. 26.) However, the ALJ's decision noted Dr. Singh's opinion that Plaintiff "had limitations in fine manipulation and overhead reaching." (A.R. 169.) The ALJ then found that Dr. Singh's opinions, including the fine manipulation and overhead reaching limitations, were entitled to little weight for the reasons discussed above. (A.R. 169.) The Court finds that this reasoning was sufficiently specific and the ALJ adequately addressed the fine manipulation and overhead reaching limitations.

For the foregoing reasons, the ALJ did not err in the weight given Dr. Singh's opinions.

**B.      VE Testimony**

Plaintiff next argues that the ALJ erred by failing to identify an apparent conflict between the Dictionary of Occupational Titles ("DOT") and the Vocational Experts' ("VE") testimony. (ECF No. 23 at 27-30.)

1.      Legal Standards

At Step Five of the five-step sequential evaluation process for determining if a person is eligible for benefits, the burden shifts to the Commissioner to show that there are a significant

number of jobs in the national economy that the claimant can perform given his or her RFC, age, education, and work experience. *Gomez v. Chater,* 74 F.3d 967, 970 (9th Cir. 1996). The Commissioner can meet this burden either through the testimony of a VE, or by reference to the Medical-Vocational Guidelines. *Ayala v. Astrue,* 2010 WL 2757492, at *4 (C.D. Cal. July 12, 2010) (citing *Osenbrock v. Apfel,* 240 F.3d 1157, 1162 (9th Cir. 2001); *Bray v. Comm'r of Soc. Sec. Admin.,* 554 F.3d 1219, 1223 (9th Cir. 2009)).

When a vocational expert testifies "about the requirements of a job or occupation, the adjudicator has *an affirmative responsibility* to ask about any possible conflict between that ... evidence and information provided in the [*Dictionary of Occupational Titles*]." *Massachi v. Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007), *quoting* SSR 00-4p (emphasis in original). The Ninth Circuit has explained:

> [I]t's important to keep in mind that the *Dictionary* refers to 'occupations,' not to specific jobs. 'Occupation' is a broad term that includes 'the collective description' of 'numerous jobs' and lists 'maximum requirements' of the jobs as 'generally performed.' SSR 00-4P, 2000 WL 1898704, at *2-3. Because of this definitional overlap, not all potential conflicts between an expert's job suitability recommendation and the *Dictionary's* listing of 'maximum requirements' for an occupation will be apparent or obvious. And, to reiterate, an ALJ need only follow up on those that are.
>
> For a difference between an expert's testimony and the *Dictionary's* listings to be fairly characterized as a conflict, it must be obvious or apparent. This means that the testimony must be at odds with the *Dictionary's* listing of job requirements that are essential, integral, or expected. This is not to say that ALJs are free to disregard the *Dictionary's* definitions or take them with a grain of salt—they aren't. But tasks that aren't essential, integral, or expected parts of a job are less likely to qualify as apparent conflicts that the ALJ must ask about. Likewise, where the job itself is a familiar one—like cashiering—less scrutiny by the ALJ is required.

*Gutierrez v. Colvin,* 844 F.3d 804, 807-08 (9th Cir. 2016).

If there is an obvious and apparent conflict between the vocational expert's testimony and the requirements in the DOT, the ALJ must "obtain a reasonable explanation" for that conflict. *Id.* at 1153. Any such explanation must be supported by "persuasive evidence" in the record. *Id.* Thus, in examining vocational expert testimony in conjunction with the DOT, an ALJ must "first determine whether a conflict exists." *Id.* "If it does, the ALJ must then determine whether the vocational expert's explanation for the conflict is reasonable and whether a basis exists for relying on the expert rather than the *Dictionary of Occupational Titles.*" *Id.* Where an

ALJ fails to ask if the vocational expert's testimony conflicts with the DOT, the ALJ has erred. *Id.*

2.    Analysis

At the May 22, 2019 hearing, the ALJ first asked the VE to assume a hypothetical individual with the claimant's age, education, and work history, who could perform work at the light exertional level but could stand or walk for a maximum amount of four hours in a workday, occasionally tolerate ramps and stares, never use ladders, ropes, or scaffolding, occasionally tolerate environments with respiratory irritants, never work at unprotected heights or around heavy machinery with fast-moving parts, frequently reach and handle bilaterally, perform noncomplex routine tasks, and "at a minimum, this individual would need to utilize a walker for ambulation at least once a month." (A.R. 60.) The VE testified that there would be work available as an information clerk, office helper, or mail clerk. (A.R. 61.)

For the second hypothetical, the ALJ asked the VE to consider the same individual except he would require a walker for both ambulation and standing for a minimum of at least one time a month. (A.R. 61.) The VE testified that there would be jobs available as an order clerk, semiconductor bonder, or assembler. (*Id.*) The ALJ then asked the VE to assume the same individual described in the second hypothetical, except that they would only be able to perform work at the sedentary level. (*Id.*) The VE testified that the same jobs would be available as in the second hypothetical. (A.R. 62.)

The ALJ also asked the VE if any of his testimony contradicted the DOT or addressed areas not otherwise discussed by the DOT. (A.R 62.) The VE testified that "[t]he standing and walking, and use of the walker would be based upon my experience and training, your honor." (*Id.*)

The ALJ's RFC reflected the third hypothetical posed to the VE.[3] (*See* A.R. 22, 61-62.) At Step Five, the ALJ reasoned as follows:

---

[3] Specifically, the ALJ found that Plaintiff is able to perform sedentary work as defined in 20 C.F.R. 416.967(a) and can lift and carry ten pounds occasionally and less than ten pounds frequently, sit for at least six hours in an eight-hour workday, stand and walk for a maximum of two hours in an eight-hour workday, occasionally climb ramps and stairs, never climb ladders, ropes, or scaffolds, occasionally be exposed to fumes, odors, dusts, gases, and other respiratory irritants, never be exposed to unprotected heights or heavy machinery with fast-moving parts, frequently reach and handle bilaterally, perform noncomplex routine tasks, and utilize a walker a minimum of one time per month for ambulation and standing. (A.R. 22.)

1

2
3
4
5
6
7
8
9
10
11
12
13
14

> If the claimant had the residual functional capacity to perform the full range of sedentary work, a finding of "not disabled" would be directed by Medical-Vocational Rule 201.24 and Rule 201.18. However, the claimant's ability to perform all or substantially all of the requirements of this level of work has been impeded by additional limitations. To determine the extent to which these limitations erode the unskilled sedentary occupational base, I asked the vocational expert whether jobs exist in the national economy for an individual with the claimant's age, education, work experience, and residual functional capacity. The vocational expert testified that given all of these factors the individual would be able to perform the requirements of representative occupations such as order clerk (DOT# 209.567-014, sedentary, SVP 2, 19,000 jobs in national economy), bonder semiconductor (DOT# 726.685-066, sedentary SVP 2, 16,000 jobs in national economy) and assembler (DOT# 726.684-110, sedentary, SVP 2, 33,000 jobs in national economy). These jobs do not require the performance of tasks precluded by the claimant's residual functional capacity.

> Pursuant to SSR 00-4p, I have determined that the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles.

> Based on the testimony of the vocational expert, I conclude that, considering the claimant's age, education, work experience, and residual functional capacity, the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy. Specifically, the above occupations individually and as a group represent significant numbers in the national economy. A finding of 'not disabled' is therefore appropriate under the framework of the above-cited rules.

15  (A.R. 29.)

16      Plaintiff argues that the ALJ erred because the minimum limitation on the use of a walker,

17  without any maximum limitations, implies that there is a complete limitation on standing or

18  walking without the use of the walker. (ECF No. 23 at 29.) Thus, "there is a significant issue

19  regarding the specific question of whether the sedentary occupational base is eroded if Mr. Lee

20  Jones were to use his walker at all times during the two hours of standing and walking, which is

21  possible under the ALJ's imprecise RFC[.]" (*Id.*) The Commissioner argues that this is

22  speculative and there is no indication that allowing Plaintiff to use a walker up to two hours per

23  day for standing and walking would erode the occupational base. (ECF No. 26 at 9.)

24      The Court finds that the ALJ's determination at Step Five was proper and supported.

25  Although the Social Security regulations acknowledge that sedentary work may include

26

27

28

occasional standing and walking, the DOT definitions for order clerk,[4] semiconductor bonder,[5] and assembler[6] do not require standing and walking, and do not preclude the use of a walker while standing and walking. *See* 20 C.F.R. § 416.967. While "an ALJ must ask follow up questions of a vocational expert when the expert's testimony is either obviously or apparently contrary to the [DOT], . . . the obligation doesn't extend to unlikely situations or circumstances." *Gutierrez,* 844 F.3d at 808. Here, there may be exceptional circumstances when Plaintiff is required to walk or stand without a walker. However, based on the DOT definitions of the occupations at issue, the frequency or necessity of these tasks is unlikely and unforeseeable. *See id.* (finding that there was no obligation for an ALJ to resolve a conflict "where the frequency or necessity of a task is unlikely and unforeseeable"). Therefore, there is no obvious and apparent conflict between the DOT and the VE's testimony that Plaintiff could perform work as an order clerk, semiconductor bonder, or assembler despite his need for a walker while standing and walking. Because there was no obvious and apparent conflict, the ALJ did not err.[7]

---

[4] "Takes food and beverage orders over telephone or intercom system and records order on ticket: Records order and time received on ticket to ensure prompt service, using time-stamping device. Suggests menu items, and substitutions for items not available, and answers questions regarding food or service. Distributes order tickets or calls out order to kitchen employees. May collect charge vouchers and cash for service and keep record of transactions. May be designated according to type of order handled as Telephone-Order Clerk, Drive-In (hotel & rest.); Telephone-Order Clerk, Room Service (hotel & rest.)." *Dictionary of Occupational Titles,* 209.567-014 (Order Clerk, Food and Beverage), 1991 WL 671794.

[5] "Tends automatic bonding machine that bonds gold or aluminum wire to integrated circuit dies to connect circuitry to package leads: Reviews schematic diagram or work order to determine bonding specifications. Turns dials to set bonding machine temperature controls and to regulate wire feeding mechanism. Mounts spool of wire onto holder and inserts wire end through guides, using tweezers. Positions semiconductor package into magazine of automatic feed mechanism, and observes package, using microscope or equipment display screen, to ensure connections to be bonded are aligned with bonding wire. Adjusts alignment as necessary. Activates machine that automatically bonds wire to specified connections on semiconductor package leads. Removes packages from bonding machine and places packages in work tray. May test tensile strength of bonded connections, using testing equipment. May locate connections and bond wire to connect circuitry of hybrid circuits, using precision-bonding machine." *Dictionary of Occupational Titles* 726.685-066 (Bonder, Semiconductor), 1991 WL 679631.

[6] "Inspects printed circuit board (PCB) assemblies for defects, such as missing or damaged components, loose connections, or defective solder: Examines PCB's under magnification lamp and compares boards to sample board to detect defects. Labels defects requiring extensive repairs, such as missing or misaligned parts, damaged components, and loose connections, and routes boards to repairer. Performs minor repairs, such as cleaning boards with freon to remove solder flux; trimming long leads, using wire cutter; removing excess solder from solder points (connections), using suction bulb or solder wick and soldering iron; or resoldering connections on PCB's where solder is insufficient. Maintains record of defects and repairs to indicate recurring production problems. May reposition and solder misaligned components. May measure clearances between board and connectors, using gauges." *Dictionary of Occupational Titles,* 726.684-110 (Touch-up Screener, Printed Circuit Board Assembly), 1991 WL 679616.

[7] Plaintiff also argues that the ALJ "failed to make a finding regarding Mr. Lee Jones' need for the walker based on 'poor balance' or 'unsteady gait' issues, per direction of the AC Order." (Doc. No. 23 at 30.) (*See also* A.R. 178-80.)

### C.    Subjective Symptom Testimony

Finally, Plaintiff argues that the ALJ erred in her evaluation of his subjective symptom testimony. (ECF No. 23 at 31-36.)

1.    Legal Standards

The Ninth Circuit has summarized the ALJ's task with respect to assessing a claimant's credibility as follows:

> To determine whether a claimant's testimony regarding subjective pain or symptoms is credible, an ALJ must engage in a two-step analysis. First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged. The claimant, however, need not show that her impairment could reasonably be expected to cause the severity of the symptom she has alleged; she need only show that it could reasonably have caused some degree of the symptom. Thus, the ALJ may not reject subjective symptom testimony ... simply because there is no showing that the impairment can reasonably produce the degree of symptom alleged.
>
> Second, if the claimant meets this first test, and there is no evidence of malingering, the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so[.]

*Lingenfelter v. Astrue*, 504 F.3d 1028, 1035-36 (9th Cir. 2007) (citations and quotation marks omitted).

In weighing a claimant's credibility, an ALJ may consider, among other things, the claimant's reputation for truthfulness, inconsistencies either in the claimant's testimony or between her testimony and her conduct, the claimant's daily activities, her work record, and

---

Under the Social Security regulations, an ALJ "shall take any action that is ordered by the Appeals Council and may take any additional action that is not inconsistent with the Appeals Council's remand order." 20 C.F.R. § 416.1477(b). In an order dated May 10, 2018, the Appeals Council found that "further evaluation of the claimant's ability to ambulate throughout the period at issue and to what extent, if any, he needs a walker, is necessary." (A.R. 179.) The Appeals Council directed the ALJ to: 1) obtain additional evidence, including a consultative examination and medical source opinions, concerning Plaintiff's gait; 2) "if necessary, obtain evidence from a medical expert related to the nature and severity of and functional limitations resulting from the claimant's impairment"; 3) reconsider Plaintiff's RFC; and 4) obtain evidence from a VE to clarify the effect of Plaintiff's assessed limitations on the occupational base, including resolving any conflicts between the DOT and the evidence provided by the VE. (A.R. 179.) The ALJ complied with this directive and obtained additional evidence, conducted a new hearing, solicited testimony from a VE, reevaluated Plaintiff's RFC, and issued a new decision providing a rationale for her decisions. (*See* A.R. 15-65, 544-51, 703-15.)  Further, the Appeals Council denied Plaintiff's request for review of the ALJ's decision, finding "no reason under our rules" to review it. (A.R. 4.) *See also Robinson v. Astrue*, 2013 WL 396174, at *2 (C.D. Cal. Feb. 1, 2013) ("Irrespective of whether the ALJ complied with the Appeal's Council's remand order, the issue before the Court in this action for judicial review is whether the ALJ's decision is based on substantial evidence and is free of legal error."). Thus, Plaintiff's argument that the ALJ erred in failing to comply with the Appeals Council's May 10, 2018 order is without merit.

testimony from physicians and third parties concerning the nature, severity, and effect of the claimant's symptoms. *Thomas v. Barnhart,* 279 F.3d 947, 958-59 (9th Cir. 2002) (citation omitted). If the ALJ's credibility finding is supported by substantial evidence in the record, the Court "may not engage in second-guessing." *Id.*

2.   Analysis

Given that there is objective medical evidence of an underlying impairment in this case, the Court examines whether the ALJ rejected Plaintiff's subjective symptom testimony by offering specific, clear, and convincing reasons.

In her opinion, the ALJ evaluated Plaintiff's subjective symptom testimony as follows:

> The claimant provided the following testimony that is not fully consistent with the record as discussed later in the decision. He lives in a second floor apartment with his girlfriend that is accessible by approximately 15 steps. His work history consists of doing 'odd jobs.' He has done no chores or activities since 2011. He uses a walker every day to go out and move around inside his home. He has been using one for five years. However, he rarely goes out. He takes medication and it makes him feel drowsy. He wakes up and takes a shower. His girlfriend's father provides transportation. The intermittent pain in his neck affects his arms and hands. He can open a door on his own. He also has sciatic nerve pain. He can be on his feet for about 5 minutes, even with a walker; he can sit for 10-15 minutes then he needs to stretch; and he can lift about 5 pounds. He lays down for about 12 hours per day. He mentioned having Valley fever, he has trouble breathing at times and he has a pacemaker.

> After careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.

> As for the claimant's statements about the intensity, persistence, and limiting effects of his or her symptoms, they are not consistent with the medical evidence of record. On remand, the main issue is the necessity of the walker. The claimant ambulates during the adjudicative period with and without a walker, indicating it has not been necessary for ambulation on a daily basis over the last five years as testified to by the claimant. (Ex. B2F/4, 12, 22, 43, 44; B6F/3, 16, 23, 75, 79, 88, 89, 103; B9F/4; B10F/6, 20, 46; B11F/10, 22, 39, 80, 103, 119, 213). Many appointments reflected strength was 5/5 (Ex. B2F/4, 36, 39, 42-43; B6F/23, 67; B9F/4; B10F/6, 31, 46; B11F/80); some appointments reflected strength was 4/5 (Ex. B2F/12, 19, 44; B6F/76, 89, 103; B10F/23, 28, 31; B11F/39, 62, 91, 103); and on occasion appointments reflected strength was 3/5 (Ex. B10F/23). Of note, the claimant was using a walker in June 2017 and his strength was 4/5; however, he was able to ambulate without a walker and his strength was still only 4/5 in July 2017. (Ex. B11F/91, 103). Hence there are some inconsistencies in the claimant's symptoms and abilities.

Nevertheless, x-rays of the lumbar spine showed diffusely sclerotic appearance of the bony structures. (Ex. B6F/85). Later, lumbar x-rays showed straightening of the lumbar lordosis consistent with spasm and no other abnormalities. (Ex. B8F/28). Further, no suspicious bony abnormality was found on other lumbar x-rays. (Ex. B8F/48). These findings did not cause any significant clinical issues. Treatment notes showed 5/5 motor strength in all extremities, intact sensation to light touch, normal gait, normal muscle tone, and no mention of walker. (Ex. B10F/6). In July 2017 and January and May 2018, he was ambulating without a walker and gait was stable. (Ex. B11F/39, 62, 91). Diet and exercise were recommended. (Ex. B11F/41).

In addition, back pain was described as mild but chronic and without incontinence, numbness, or weakness. (Ex. B6F/88). Neurologically, he was consistently intact. (Ex. B6F/84; B8F/20; B9F/4; B10F/6, 19-20, 24, 46, 80; B11F/119, 180). He did not follow through with physical therapy. (Ex. B6F/4, 87). There are appointments where providers note that the claimant does not use the walker. (Ex. B6F/84, 88; B9F/4 [sic] B10F/46; B11F/39, 62, 80, 91).The physician who prescribed the walker only saw the claimant once. (Ex. B1F/2). In fact, the claimant has to use stairs to access his apartment. Consequently, the record does not support the level of dysfunction the claimant discusses.

Regarding the claimant's history of coccidiomycosis meningitis with hydrocephalus and episodes of sinus pause with pacemaker, treatment notes stated that there were no symptoms of recurrence. (Ex. B6F/104). Cocci titers were stable, indicating medication was effective. (Ex. B2F/51; B11F/215, 226-228). CT scans of the head were negative for hydrocephalus and other pathology. (Ex. B2F/35; B6F.45; [sic] 104; B8F/28; B7F/2; B11F/215). A pacemaker check showed normal function. (Ex. B11F/159, 207, 236). While he had elevation of liver function tests, he was consuming alcohol. (Ex. B2F/51; B11F/226). He was advised to stop and experienced normalization of his liver function. (Id.). He later reported that he was drinking alcohol again and using marijuana. (Ex. B6F/2). Hospital records showed a complaint of recurrent headache but he admitted elsewhere that they were only occasional and were improved/controlled with Excedrin. (Ex. B6F/88, 91; B8F/4; B11F/196).

In July 2017 and January 2018, the claimant was doing well and had no issues or concerns. (Ex. B11F/37, 60, 89). His medications were refilled and he denied any headache or fevers. Liver function tests were normal. In August 2017, he reported no new symptoms and that symptoms were stable on current medications. (Ex. B11F/117). Treatment notes in 2019 showed the claimant reported some medication side effects of dry skin but he did not mention feeling drowsy as he did at the hearing. (Ex. B11F/7). In fact, it was noted that he was tolerating his medication. He notably denied headaches, blurred vision, neck pain/stiffness, chest pain, breathing issues, and weight loss. He reported smoking 4-5 blunts per day, which could be causing some of his symptoms. However, this was never looked into by his providers. While he was using a roller walker, he was described as being in no acute distress. (Ex. B11F/9-10). The cocci meningitis was considered stable with no signs of recurrence. (Ex. B11F/10).

The claimant was hospitalized from March 22, 2016 to March 28, 2016 due to coccidioidomycosis meningitis; headache; and history of sick sinus syndrome, status-post pacemaker. (Ex. B6F/73. He reported headache, right-sided weakness, neck pain, numbness of his right arm, fever, night sweats, and cough. (Ex. B6F/64). A head CT showed only an old lacunar infarct involving the left basal ganglia. (Ex. B5F/46, 55). A stroke work-up was negative. There was evidence of

16

cocci with CSF CF 1:4 and serum 1:8. He was discharged in improved condition. He was referred to physical therapy for coccidiomycosis meningitis and impaired functional mobility, balance, gait, and endurance. (Ex. B6F/4). On May 5, 2016, a bone scan showed no abnormal activity in the lumbar spine and increased activity in the right ankle, of which there is no complaint. (Ex. B6F/12). On July 5, 2016, the claimant was discharged from physical therapy after failing to return following only two sessions completed on May 20, 2016 and June 17, 2016. (Ex. B6F/4).

The claimant was hospitalized again from November 28, 2016 to November 30, 2016 due to coccidioidomycosis meningitis; headache; and history of sick sinus syndrome, status-post pacemaker. (Ex. B8F/2). Fluid analysis of CSF was consistent with cocci infection slightly improved from previous admission in March 2016. He was switched from voriconazole to fluconazole for cocci infection. (Ex. B8F/10). A head CT on November 28, 2016 was normal. (Ex. B5F/10).

Treatment notes in March 2016 reflected decreased sensation from right neck to fingertips. (Ex. B6F/23). Imaging of the neck showed no significant stenosis or occlusion. (Ex. B6F/45). A CT scan of the neck revealed no evidence for fracture or subluxation. (Ex. B6F/47). A physical examination showed 4-5/5 strength in right upper extremity and 5/5 strength in left upper extremity. (Ex. B6F/67). In November 2016, a physical examination revealed some muscular tenderness but normal neck range of motion. (Ex. B8F/13).

At a neurology consultation in October 2017, the claimant reported having one month of neck pain that intermittently radiated to his shoulders and fingers. (Ex. B10F/19). Of note the claimant denied headaches, nausea, vomiting, dizziness, vision changes, and numbness/weakness/paresthesias [sic] in any extremity. However, he reported drinking 24 ounces of alcohol per week and using 'drugs, including Marijuana, about 7 times per week.' This was against medical advice so there is a factor of noncompliance in this case. (Ex. B11F/127, 153, 226). He appeared in no acute distress, alert, and oriented. Thought content was appropriate. Mood and affect were appropriate. Judgment and insight were intact. Each extremity was examined and found to have intact sensation to light touch, 5/5 motor strength, no Hoffman's, normal tone, no atrophy or abnormal movements, and non-painful range of motion. (Ex. B10F/19-20). There was no CSF noted. (Ex. B10F/20). Breathing was unlabored. Feet and hands had good capillary refill and strong pulses. A CT scan was notably unchanged from the prior study in 2016 and the degenerative changes were localized at the C4-5 level. Surgery was not recommended.

Interestingly the claimant's physical examination two days later by a non-specialist was completely different. The claimant now reported that his neck pain was associated with weakness, numbness, tingling, nausea, dizziness, headache, worsening vision, etc. (Ex. B10F/22). Range of motion was decreased secondary to pain and strength was 4/5 in upper extremities (Ex. B10F/29, 31—same day, strength was 5/5 in upper extremities) and 3/5 in lower extremities (Ex. B10F/28, 31—same day, strength was both 4/5 and 5/5 at different times). (Ex. B10F/23). This examination and the neurological examination were separated by only two days and this examination was conducted by a medical student. The extreme differences between these two exams could be due to the examiners [sic] differences in skill level but given the degree of differences between subjective complaints and examination findings, it seems more likely that the differences are due to the claimant himself. In fact, the medical student indicated that the findings were related to subjective factors. He noted that the exam showed some

17

generalized weakness largely due to pain inhibiting movement. However, there were no focal neurological deficits. Regardless, more weight goes to the neurologist than the medical student because the neurologist has more experience and is a specialist.

Hospital records in December 2017 showed a complaint of neck pain with radiation down both arms. (Ex. B10F/6). It was noted that a CT showed mild cervical stenosis with disc protrusions at C3-4 and C4-5 and foraminal narrowing at C3-6. He was oriented in all spheres; his neck was supple; he displayed no atrophy, cranial nerve deficit, or sensory deficit; muscle tone was normal; coordination and gait were normal; and motor strength was 5/5 in all extremities. The assessment was chronic, stable degenerative changes to cervical spine. (Ex. B10F/6-7). Imaging was considered stable and there were no signs of myelopathy on exam. He was given Ibuprofen and reported significant improvement. (Ex. B10F/10). Conservative treatment was recommended. (Ex. B10F/7).

Treatment notes in January 2019 showed a complaint if intermittent neck pain with some radiation but he also denied numbness, tingling and weakness in his arms. (Ex. B11F/21). Strength in the bilateral trapezius and deltoid was 4/5; but grip strength was 5/5. (Ex. B11F/24). While there was some variation in the claimant's reporting of symptoms and examination results, I added frequent reaching and handling based on cervical imaging and reports of pain and numbness.

In December 2018, the claimant underwent a consultative physical examination. (Ex. B9F). It was noted that he appeared healthy, well nourished, and in no distress. Grip strength was higher on the right. There was no tenderness to palpation in the midline or paraspinal areas. Straight leg raise was negative and there were no muscle spasms. Range of motion was within normal limits throughout. Motor strength was 5/5 in all extremities with good tone bilaterally and good active range of motion. Sensation was grossly intact throughout. Reflexes were normal and symmetric bilaterally. Cerebellar function was normal and Romberg was negative. Gait was within normal limits and there was no mention of him using a walker.

While the claimant asserts numerous subjective complaints, the record reveals he has received only conservative and routine treatment. Overall, his conditions have responded well to this level of treatment despite issues with compliance, ongoing use of drugs and alcohol, and inconsistent presentations and reports by the claimant. The course of treatment and response to treatment in this case are therefore not consistent with the alleged severity of his impairments. His conservative treatment suggest his impairments do not result in significant functional limitation that precludes him from engaging in basic work activity. The objective medical evidence is wholly consistent with an ability to sustain sedentary work activity with the above cited limitations. The objective medical evidence does not warrant any additional nonexertional limitations beyond those established in the residual functional capacity contained herein. The objective medical evidence failed to support the alleged severity of symptoms and degree of limitation alleged by the claimant.

Finally, the evidence does not suggest the claimant is motivated to work consistently. He has an almost nonexistent work history other than his testimony. The claimant's earnings records show no income whatsoever. (Ex. B7D; B10D; B11D; B14D). According to the claimant's testimony, he has a very minimal work history with limited earnings prior to the alleged onset date. He testified that he earned $300 per week to sign up people to vote. This evidence along with the

evidence of drug and alcohol use despite recommendations to stop strongly suggests factors other than his alleged impairments affect his ability to maintain fulltime employment.

(A.R. 22-26.)

Plaintiff first argues that the ALJ "failed to explain what she means by 'conservative treatment'" and the record shows Plaintiff was treated in the ER, hospitalized on multiple occasions, prescribed Gabapentin, Tramadol, and epidural steroid injections for pain, and received a walker with a seat and a shower chair. (ECF No. 23 at 31-32.) The Commissioner, in turn, argues that the ALJ's finding was reasonable, and the ALJ specifically referred to Plaintiff's prescribed physical therapy that was not completed. (ECF No. 26 at 13.)

The Court finds that the ALJ's reasoning was sufficiently specific. *Brown-Hunter v. Colvin,* 806 F.3d 487, 493 (9th Cir. 2015) ("A finding that a claimant's testimony is not credible must be sufficiently specific to allow a reviewing court to conclude the adjudicator rejected the claimant's testimony on permissible grounds and did not arbitrarily discredit a claimant's testimony regarding pain.") (citation and quotation marks omitted). The ALJ's decision described Plaintiff's treatment as including medication and physical therapy. (A.R. 22-26.) The ALJ also cited to hospital records that referred Plaintiff for facet joint injections and pain management with oral medications, and described this treatment as conservative. (A.R. 26.)  This was specific enough to allow for meaningful review and to ensure that the ALJ was not arbitrarily discrediting Plaintiff's testimony.

Further, the ALJ did not err in characterizing Plaintiff's treatment as conservative. In *Revels v. Berryhill,* 874 F.3d 648, 667 (9th Cir. 2017), the Ninth Circuit rejected the ALJ's finding that the claimant's conservative treatment undercut her testimony because that finding was not supported by the record. There, the claimant was treated with Valium, Vlector, Soma, Vicodin, Percocet, Neurontin, Robaxin, Trazodone, and Lyrica, in addition to facet and epidural injections in her neck and back and steroid injections in her hands. *Id.* The *Revels* court found that this was not conservative treatment for fibromyalgia because it was "significantly more aggressive than the type of fibromyalgia treatment [that was] found to be conservative" in other cases. *Id.* Other cases where courts have held that pain medication and injections do not constitute conservative treatment have typically involved claimants whose pain was treated with a series of

regular injections and more invasive procedures, and that treatment was generally ineffective. *See, e.g., Garrison v. Colvin,* 759 F.3d 995, 1015 (9th Cir. 2014) (physical therapy and epidural shots were not conservative treatment where they were ineffective in treating pain); *Veliz v. Colvin,* 2015 WL 1862824, at *8 (C.D. Cal. Apr. 23, 2015) (collecting cases).

Plaintiff's treatment does not resemble what the claimant received in *Revels* or the other cases where pain medication and injections were not considered to be conservative. *See Warre v. Comm'r Soc. Sec. Admin.*, 439 F.3d 1001, 1006 (9th Cir. 2006) ("Impairments that can be controlled effectively with medication are not disabling[.]"). For example, Plaintiff cites to a single treatment note indicating that he was referred to LAGS for facet joint injections and oral medications, but did not produce any records from LAGS or other evidence that he in fact received this treatment.[8] (*See* A.R. 722.) Other than his pacemaker, Plaintiff has not undergone surgery for the relevant impairments. (*See* A.R. 703.) Further, as the ALJ noted, Plaintiff reported improvement with medication, and Plaintiff's hospitalizations and visits to the emergency room are not themselves forms of treatment. Considering the record as a whole, the ALJ's characterization of Plaintiff's treatment as conservative was reasonable and supported by substantial evidence.

Plaintiff also contests the ALJ's "fail[ure] to explain what, *if any,* impact *past* drug or alcohol use has on Mr. Lee Jones' credibility[.]" (ECF No. 23 at 32.) (Emphasis in original.) However, as the Commissioner notes, the ALJ's decision explained the effect of alcohol use on Plaintiff's liver function tests. (*See* ECF No. 26 at 12.) The ALJ also explained that Plaintiff's providers did not explore the effect his reports of smoking 4-5 blunts per day on his symptoms, and that Plaintiff's use of alcohol and drugs was against medical advice. *See Fair v. Bowen,* 885 F.2d 597, 604 (9th Cir. 1989) ("[A]n unexplained, or inadequately explained failure . . . to follow a prescribed course of treatment . . . can cast doubt on the sincerity of the claimant's pain testimony."). Therefore, contrary to Plaintiff's argument, the ALJ did explain what impact Plaintiff's drug and alcohol use had on his credibility.

Likewise, Plaintiff asserts that the ALJ failed to explain or cite to specific examples in the record of Plaintiff's "inconsistent presentations." (ECF No. 23 at 32.) However, a review of the

---

[8] Plaintiff's brief refers to A.R. 723, but this appears to be a typographical error. (*See* ECF No. 23 at 32.)

ALJ's decision reveals that she identified several specific examples, including hospital records demonstrating inconsistent reports regarding Plaintiff's headaches as well as inconsistent presentations at a neurology consultation in October 2017 and to a non-specialist medical student two days later. (A.R. 24, 25.) Thus, this argument is also without merit.

Plaintiff next argues that the ALJ failed to specify what she meant by generally stating that the objective medical evidence did not warrant additional limitations and failed to support the Plaintiff's alleged severity of symptoms and degree of limitation. (ECF No. 23 at 34.) The Commissioner argues that the ALJ properly found Plaintiff's allegations of disabling symptoms were not supported by the objective evidence. (ECF No. 26 at 11-12.) The Court agrees. Contrary to Plaintiff's argument, the ALJ spent approximately three pages and thirteen paragraphs describing the objective medical evidence that supported her finding. This discussion immediately followed the paragraph that Plaintiff contends was unsupported. Having reviewed the ALJ's reasoning and underlying citations, and in light of the record as a whole, the ALJ did not err in finding that Plaintiff's subjective symptom testimony was not supported by the objective medical evidence.

Additionally, Plaintiff argues that the ALJ erred "by failing to *specifically* address Mr. Lee Jones' testimony, other than in a 'summary' of testimony[.]" (A.R. 35.) However, having reviewed the ALJ's decision, the Court finds that it is sufficiently specific. The ALJ gave a detailed written opinion summarizing the specific statements from Plaintiff that were not credible and the evidence that undermined Plaintiff's complaints. This is distinguishable from other cases where the ALJ erred by making a single, generalized statement that the claimant's statements were not credible. *See, e.g., Treichler v. Comm'r of Soc. Sec. Admin.,* 775 F.3d 1090, 1102-03 (9th Cir. 2014) (holding that an ALJ erred by making "only the single general statement that 'the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.'"); *Brown-Hunter,* 806 F.3d at 493 (finding that an ALJ erred because she "stated only that she found, based on unspecified claimant testimony and a summary of medical evidence," that the claimant's impairments were less serious than alleged).

///

Finally, Plaintiff argues that the ALJ's citation to Plaintiff's "minimal work history" is not a clear and convincing reason to reject his testimony. (ECF No. 23 at 35-36.) This is incorrect. As the Commissioner correctly argues, poor work history is a clear and convincing reason that the ALJ may rely on to reject a Plaintiff's subjective testimony. *Thomas v. Barnhart,* 278 F.3d 947, 959 (9th Cir. 2002). (*See* ECF No. 26 at 13-14.) Plaintiff also asserts that the ALJ's finding was not supported by substantial evidence and cites to his own testimony that he worked a number of jobs and received earnings under the table. (ECF No. 23 at 36.) However, the ALJ specifically cited to Plaintiff's testimony in support of her finding. (*See* A.R. 26.) Plaintiff's testimony describing his past work reflects a minimal work history as described by the ALJ and does not contradict or undermine this characterization. Thus, the ALJ's finding was supported by substantial evidence.

In light of the record as a whole, the Court finds that the ALJ did not err in discounting Plaintiff's subjective symptom testimony.

## II.      CONCLUSION AND ORDER

In light of the foregoing, the decision of the Commissioner of Social Security is supported by substantial evidence, and the same is hereby affirmed.

The Clerk of the Court is directed to close this case.

IT IS SO ORDERED.

Dated:   __May 18, 2022__                          /s/ *Erica P. Grosjean*
                                                    UNITED STATES MAGISTRATE JUDGE